# UNITED STATES DISTRICT COURT
for the
Middle District of North Carolina


FILED
JUL 25 2025
Clerk U.S. District Court
Greensboro, NC
BY_____

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
) Case No. 1:25MJ 291
INFORMATION ASSOCIATED WITH THE CELLULAR )
DEVICE (336) 209-8691, THAT IS STORED AT )
PREMISES CONTROLLED BY VERIZON WIRELESS )

### APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A

located in the _____ District of _____New Jersey_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Possession of a Firearm and/or Ammunition by a Convicted Felon |

The application is based on these facts:
See Affidavit

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *) is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Trevor Mayes
*Applicant's signature*

Trevor Mayes, Special Agent, ATF
*Printed name and title*

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: 7/25/2025

*Judge's signature*

City and state: Durham, North Carolina

Hon. Joe L. Webster, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE (336) 209-8691, THAT IS STORED AT PREMISES CONTROLLED BY VERIZON WIRELESS | Case No. 24-04322 |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Trevor Mayes, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number (336) 209-8691, ("the SUBJECT PHONE"), that is stored at premises controlled by Verizon Wireless, a wireless telephone service provider headquartered at 180 Washington Valley Road, Bedminster, NJ 07921. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require Verizon Wireless to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and have been so employed since April of 2023. I am a graduate of the Federal Law Enforcement Training Center Uniformed Police Training Program, Criminal Investigator Training Program, as well as the ATF National Academy, where I received

extensive training in the investigation of firearms, controlled substances, arson, and explosives offenses.

3. Prior to my career with ATF, I was employed as a Police Officer with the Pentagon Force Protection Agency since 2020. Within that role, I enforced laws according to the Code of Federal Regulations and the Virginia State Code. While working for PFPA, I made arrests, collected and preserved evidence, conducted suspect and witness interviews, and more. I have a Bachelor of Science Degree in Homeland Security from East Coast Polytechnic Institute Virginia Beach, VA.

4. During my career with ATF, I have conducted and participated in case investigations involving violations of the Gun Control Act and the National Firearms Act. Those violations include firearms possession by prohibited persons, straw purchasing, unlicensed dealing of firearms, trafficking of firearms, machinegun manufacturing, etc. In furtherance of these investigations, I have utilized multiple investigative techniques including but not limited to physical and electronic surveillance, controlled purchases of evidence, management of confidential informants, examination of electronic evidence, and the seizure of electronically stored communications.

5. I have experience and/or training on monitoring and gathering information received from pen register and/or trap and trace device, real time GPS and geo-location information, and historical call detail records. I have participated in the execution of search warrants authorizing the seizure of evidence in criminal investigations. Through this experience, I have been able to successfully gather criminal intelligence and utilize this information in furtherance of ongoing criminal investigations.

6. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 922(g)(1) [Possession of a Firearm/Ammunition by a Convicted Felon], have been committed Jaheim Tyquan BROWN. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes as further described in Attachment B.

## PROBABLE CAUSE

8. On January 28, 2025, at approximately 7:56 p.m., patrol officers with the Greensboro Police Department (GPD) responded to a domestic dispute at an apartment at the 3200 block of South Holden Road, Greensboro, North Carolina (NC) 27407, hereinafter Scene-1. Computer Aided Dispatch (CAD) notes stated that a third-party caller was on the phone with Victim-1, when Victim-1 was involved with a domestic dispute with her boyfriend, later identified as Jaheim Tyquan BROWN (B/M, DOB 07/XX/2002; FBI 6A92DDD5C). According to CAD, the third-party caller heard a gunshot before the phone call ended.

9. Upon arrival at the previously stated apartment, GPD made contact with Victim-1, who was with her toddler child. BROWN is the father of Victim 1's child. Victim-1 said she heard a knock at the door and assumed it was her friends that she had been expecting. Victim-1 opened the door and saw BROWN, instead. Victim-1 asked BROWN to leave but he was adamant about seeing his child. BROWN eventually returned to his vehicle in the Public Vehicular Area (PVA) of the apartment complex.

3

10. Victim-1 said her friends arrived in the PVA and called her to let her know that BROWN was still inside of his vehicle, which was still inside of the PVA of the apartment complex. Victim-1 then stated shortly after, BROWN went back to her apartment and kicked the door open. BROWN then yelled "bitch, stop playing with me" as he pulled a black pistol from his waistband. Victim-1 said BROWN kept the firearm pointed at the ground while he was yelling. BROWN then left the apartment and returned to his vehicle.

11. Shortly after the incident in her apartment, Victim-1 walked down to the PVA to see if BROWN left. Victim-1 said she was standing on the sidewalk when BROWN pulled around in his vehicle and fired three shots at her before driving away. Victim-1 described BROWN's vehicle as a gray/silver Kia, possibly a K5. Victim-1 believed the vehicle was possibly a rental.

12. Crime Scene Investigators (CSI) responded to Scene-1 and collected two (2) spent shell casings from the PVA. One spent casing is described as a Federal Cartridge "FC" brand 9mm luger. The second spent casing is described as a Hornady brand 9mm luger. GPD Officer Matthews later obtained a warrant for BROWN for Breaking and Entering with Intent to Terrorize, Assault with a Deadly Weapon with Intent to Kill, and Communicating Threats.

13. Sometime after the warrants were obtained for BROWN, GPD's Violent Crime Apprehension Team (VCAT) was tasked with locating and apprehending BROWN. VCAT successfully arrested BROWN on February 3, 2025. I later spoke to Detective Buchanan with VCAT and learned that Victim-1 informed detectives of BROWN's cell phone number, 336-209-0861 (hereinafter SUBJECT PHONE). VCAT then obtained a Pen Register/Trap and Trace (PRTT) for SUBJECT PHONE to locate BROWN. Using the PRTT for SUBJECT PHONE, VCAT was able to locate and apprehend Brown. Additionally, Detective Buchanan stated that

4

according to the PRTT information he has, it appears that BROWN may have been in the area of Scene-1 on the day of the incident. It should be noted that the PRTT information has not been analyzed by a specialist yet.

14. I queried SUBJECT PHONE in law enforcement databases; however no information shows BROWN as the subscriber. Through my training and experience, I know it is very common for individuals that engage in illegal activity to use phone numbers that are subscribed to a different person. This is often done to avoid detection and make it harder for law enforcement to trace their activity. Some common methods include using a prepaid or "burner" phone, using someone else's identity to buy a phone, or having an associate use their identity to buy a phone for them.

15. On March 10, 2025, Officer Lambui and Officer Mayo were assigned to the Traffic Safety Unit (TSU) acting as a two-man unit in an unmarked GPD vehicle. Officers conducted a traffic stop when they observed a vehicle with a very dark window tint. While making contact with the driver, Man-1, officers observed two unloaded firearms on the dashboard. Officer Mayo used his tint reader on one of the windows, which read 4% tint – a violation of NC tint laws. Officer Mayo asked Man-1 if there were any other firearms in the vehicle, in which he "Uhm not that I know of".

16. Due to the presence of firearms and Man-1 becoming irate as the traffic stop continued, officers requested all vehicle occupants to step out. Andre Gordon (B/M; DOB 08/XX/2003) exited the passenger side rear seat, and Man-2, exited the front passenger seat. Officer Lambui asked the passenger if they had anything on them. Mr. Gordon produced two pouches from his hoodie pocket and advised officers that they contained marijuana. Man-2 denied having anything on his person.

17. Officer Lambui conducted a probable cause search of the vehicle and located an additional firearm underneath the front passenger seat. Mr. Gordon claimed ownership of the firearm and said that he did not have enough time to put it on the dashboard. The firearm was a black Glock, Model 17, 9mm pistol, bearing serial number BXNW639, with a tan colored magazine.

18. Officer Lambui ran all three vehicle occupants in a law enforcement database and learned that Mr. Gordon had an active arrest warrant. Mr. Gordon was given a citation for simple possession of marijuana and carrying a concealed weapon. The Glock 17 pistol was seized. Mr. Gordon was later booked into jail for his warrants.

19. On March 11, 2025, the Glock 17 that was seized from Mr. Gordon was test fired by GPD. The National NIBIN Correlation and Training Center (NNCTC) developed a lead based on a correlation review of ballistic evidence between cartridge casings from Scene-1, discussed supra in paragraphs 11 and 12, and cartridge casings from the test fire of the recovered Glock, Model 17, 9mm pistol, bearing serial number BXNW639.

20. On June 11, 2025, I reviewed report 22-10-013054, which was prepared by the Cordele (Georgia) Police Department (CPD). The report states that on October 25, 2022, an officer with CPD observed a silver Honda Accord speeding and a traffic stop was attempted, however, a pursuit ensued. Eventually, the Moore County Sheriff's Office performed a Precision Immobilization Technique (PIT) on the Honda, which caused it to come to a stop.

21. Man-3 (driver), Andre Gordon (passenger), and BROWN (passenger) were inside the Honda. Deputies located marijuana residue on the vehicle's windows as if someone was throwing marijuana from the vehicle. Additionally, a firearm was found in the vehicle.

6

22. Due to Mr. Gordon and BROWN being in a vehicle together in 2022, which was involved in criminal conduct, and the fact that Mr. Gordon was later in possession of a Glock 17 pistol on March 10, 2025, that, according to a NIBIN lead, may have been used to carry out the shooting in Scene-1 by BROWN, it can be reasonably concluded that Mr. Gordon and BROWN are close associates.

23. In my training and experience, I have learned that it is common for individuals who carry out shootings to dispose of the firearm afterwards, in an effort to distance themselves from the firearm, which makes it more difficult for law enforcement to link them to the shooting. Methods of disposing firearms vary, however, one method is to simply give or sell the firearm to a close associate.

24. In my training and experience, I have learned that Verizon Wireless is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

25. Based on my training and experience, I know that Verizon Wireless can collect cell-site data about the SUBJECT PHONE. I also know that wireless providers such as Verizon Wireless typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

26. Based on my training and experience, I know that Verizon Wireless also collects per-call measurement data, which Verizon also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based on the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

27. Based on my training and experience, I know that wireless providers such as Verizon Wireless typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as Verizon Wireless typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the SUBJECT PHONE's user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

28. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

29. I further request that the Court direct Verizon Wireless to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on Verizon Wireless, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,
**/S/ Trevor Mayes**
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

In accordance with Rule 4.1(b)(2)(A), the Affiant attested under oath to the contents of this Affidavit, which was submitted to me by reliable electronic means, on this 25th day of July, 2025, at 8:45 a.m.

_____
Hon. Joe L. Webster
UNITED STATES MAGISTRATE JUDGE

9

## ATTACHMENT A

**Property to Be Searched**

This warrant applies to records and information associated with the cellular telephone assigned call number (336) 209-8691 ("the Account"), that is stored at premises controlled by Verizon Wireless ("the Provider"), headquartered at 180 Washington Valley Road, Bedminster, NJ 07921.

## ATTACHMENT B

### Particular Things to be Seized

### I. Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period of **December 28, 2024 to February 3, 2025**:

    a. The following information about the customers or subscribers of the Account:

        i. Names (including subscriber names, user names, and screen names);

        ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii. Local and long distance telephone connection records;

        iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v. Length of service (including start date) and types of service utilized;

        vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

   i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

   ii. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received as well as per-call measurement data (also known as the "real-time tool" or "RTT" data).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and/or instrumentalities of violations of 18 U.S.C. § 922(g)(1) involving Jaheim Tyquan BROWN during the period December 28, 2024, to February 3, 2025 including:

1. The identity of the person(s) who created and/or used the account associated with the above referenced cellular telephone number, including records that help reveal the whereabouts of such person(s); and

2. Evidence indicating the geographic location of the cellular device associated with the above referenced cellular telephone number during the relevant time frame; and

3. Evidence indicating how and when the above reference cellular telephone number was used to determine the chronological context of cellular device use, account access, and events during the relevant time frame; and

4. Evidence regarding the possession, transfer, sale, or disposal of firearms during the relevant time period.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.